IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


ADIL B. AKHMEDOV,                                    Case No. 3:16-cv-02017-SB

      Plaintiff,                                        **OPINION AND ORDER**

      v.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

      Defendant.

_____

**BECKERMAN, Magistrate Judge.**

      Adil B. Akhmedov ("Plaintiff") brings this appeal challenging the Commissioner of the

Social Security Administration's ("Commissioner") denial of his application for Supplemental

Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f.[1]

The Court has jurisdiction to hear this appeal pursuant to 42 U.S.C. § 1383(c)(3), which

incorporates the review provisions of 42 U.S.C. § 405(g). For the reasons that follow, the Court

---

[1] Plaintiff also filed an application for Disability Insurance Benefits ("DIB"), which the
Commissioner denied because Plaintiff "had not accumulated sufficient work credits to qualify."
(Def.'s Br. at 2 n.1; Tr. 22, holding that Plaintiff "does not have enough work credits to qualify
for . . . Disability Insurance Benefits"). Plaintiff does not challenge the denial of his application
for DIB in this appeal. (See Pl.'s Opening Br. at 1-15, declining to contest Plaintiff's eligibility
for DIB.)

affirms the Commissioner's decision because it is free of harmful legal error and supported by substantial evidence.

## BACKGROUND

Plaintiff is a native of Uzbekistan who came to the United States as a refugee over nine years ago and later became a naturalized United States citizen. (Tr. 39, 49, 290.) He was born in June 1964, making him forty-eight years old on March 15, 2013, the day he filed his protective application.[2] (Tr. 38.) Plaintiff's past relevant work experience includes time as a janitor. (Tr. 38.) In his application for SSI, Plaintiff alleges disability due to depression, migraines, lower back, heart, and bone pain, memory loss, low blood pressure, and "short[ness] of breath." (Tr. 69, 85, 219.)

On January 15, 2013, Plaintiff suffered a heart attack and had a stent implanted. Dr. Nickolas Juliano ("Dr. Juliano") advised Plaintiff of the "importance of smoking cessation," and noted that "[h]e may need staged intervention in the left anterior descending artery" in the future. (Tr. 294.)

In an Exercise Stress Echocardiographic Report dated March 27, 2013, Matthew Janssen ("Janssen"), a cardiac sonographer, noted that Plaintiff's exercise capacity was "[a]verage for [his] age," Plaintiff reported experiencing chest pressure during the exam, but did not complain of "chest pain with exertion," and the exam was indicative of "[c]oronary artery disease." (Tr. 322.)

---

[2] The relevant period here is March 15, 2013, the date Plaintiff filed his protective application, to June 2, 2015, the date of the ALJ's decision, because SSI is not retroactive. *See Koster v. Comm'r Soc. Sec.*, 643 F. App'x 466, 478 (6th Cir. 2016) ("For purposes of SSI, which is not retroactive, the relevant period here is September 24, 2010, the date Koster filed his protective application, to August 15, 2012, the date of the ALJ's decision." (citing 20 C.F.R. § 416.335)).

On April 18, 2013, Plaintiff presented for a follow-up visit with Terrance James ("James"), a family nurse practitioner, regarding "headaches, dizziness in [the morning], joint and muscle pain." (Tr. 377.) Plaintiff reported that his "symptoms get better as [the] day goes on" and are "worse when he wakes up." (Tr. 377.) James noted that Plaintiff appeared "alert" and in "no apparent distress" on physical examination, that Plaintiff suffers from "anxiety, depression, difficulty falling asleep, early morning awakening, fatigue, nervous breakdown, and [generally] not doing well since his heart attack" in January 2013, and that Plaintiff's wife wanted "him to engage in therapy" because he was "not improving on [anti-depressants] alone." (Tr. 377-78.)

On May 15, 2013, Plaintiff visited Dr. S. Albert Camacho ("Dr. Camacho"), a cardiologist at Oregon Health and Sciences University. Plaintiff reported that he "continue[d] to feel poorly" and was experiencing "on-going pin pricks in his chest" that "occur at rest and last many hours." (Tr. 328.) Plaintiff also complained of "fatigue . . . at some times but not others," reported a "history of chronic headaches," and denied "excessive lightheadedness, syncope, or falls." (Tr. 328.) Dr. Camacho noted that Plaintiff's coronary artery disease was "asymptomatic," his reports of feeling on-going pin pricks in his chest are "atypical" and "non-cardiac," his hypertensive heart disease was "controlled and excellent," and his "anxiety-depression" was "[p]robably post-traumatic syndrome" and the "likely cause of fatigue" and difficulty breathing. (Tr. 330-31.)

On May 21, 2013, Plaintiff appeared for a psychotherapy session with Margaret Mahlik ("Mahlik"), a licensed clinical social worker. Plaintiff complained of poor sleep and indicated that he was interested in medication to treat nightmares that stem from his time serving in the Soviet-Afghan War. In her progress notes, Mahlik observed that Plaintiff's affect was "brighter

than [his] previous session" with Mahlik, that Plaintiff's "[o]rientation, judgment, insight, and memory [were] all within normal limit," that Plaintiff suffers from posttraumatic stress disorder and depression, and that Plaintiff's Global Assessment of Functioning ("GAF") score was fifty-eight.[3] (Tr. 345.)

In a progress note dated June 5, 2013, Mahlik noted that Plaintiff reported "having fears about sleeping/nightmares" on a daily basis, that Plaintiff's mental health symptoms "remained at the same level" as the previous session, that Plaintiff reported being extremely irritable, but that was "not shown [during their] session," and that Plaintiff's orientation, judgment, insight, memory, attention, concentration, and thought content were "all within normal limits." (Tr. 340-41.)

On June 24, 2013, Dr. Dorothy Anderson ("Dr. Anderson"), a non-examining state agency psychologist, completed a psychiatric review technique assessment. (Tr. 74-75.) Based on her review of the record, Dr. Anderson concluded that the limitations imposed by Plaintiff's mental impairments failed to satisfy listings 12.04 (affective disorders) and 12.06 (anxiety-related disorders).

Also on June 24, 2013, Dr. Anderson completed a mental residual functional capacity assessment form, in which Dr. Anderson rated Plaintiff's limitations in each of sixteen categories of mental ability. (Tr. 77-79.) Dr. Anderson rated Plaintiff to be "not significantly limited" in ten categories and "moderately limited" in six categories. (Tr. 77-78.) Dr. Anderson also concluded that Plaintiff is capable of (1) understanding and remembering short and simple instructions, (2)

---

[3] "GAF rates overall psychological functioning on a scale of 0–100 that takes into account psychological, social, and occupational functioning." *Zabala v. Astrue*, 595 F.3d 402, 405 n.1 (2d Cir. 2010). A GAF score of fifty-eight "suggests moderate difficulties in occupational functioning." *Goble v. Astrue*, 385 F. App'x 588, 594 (7th Cir. 2010) (citation omitted).

carrying out short and simple instructions, (3) completing short and simple tasks with "regular

scheduled breaks," and (4) "only superficial coworker contact" and no contact with the public.

(Tr. 77-78.)

On June 25, 2013, Dr. Martin Kehrli ("Dr. Kehrli"), a non-examining state agency

physician, completed a physical residual functional capacity assessment. (Tr. 75-77.) Dr. Kehrli

concluded that Plaintiff can lift and carry twenty pounds occasionally and ten pounds frequently,

stand, sit, or walk up to six hours during an eight-hour workday, and push or pull in accordance

with his lifting and carrying restrictions. Dr. Kehrli also concluded that Plaintiff does not suffer

from any postural, manipulative, visual, or communicative limitations, but Plaintiff does need to

avoid concentrated exposure to hazards, such as machinery and heights, due to episodes of

dizziness.

In a treatment note dated June 28, 2013, Tina Walde ("Walde"), a treating psychiatric

mental health nurse practitioner, noted that Plaintiff reported that he had not "noticed any

improvement in [his] mood" and he continued to "wake several times during the night" and "feel

low energy and fatigue during the day," but he was having fewer nightmares and his energy

levels were "somewhat improving." (Tr. 397.) Walde also observed that Plaintiff's affect and

symptoms had "improved" on Zoloft, Plaintiff was less irritable, and Plaintiff's orientation,

judgment, memory, attention, concentration, and thought content were all within normal limits.

(Tr. 397-98.)

On November 19, 2013, Dr. Kordell Kennemer ("Dr. Kennemer"), a non-examining state

agency psychologist, completed a psychiatric review technique assessment, agreeing with Dr.

Anderson's finding that Plaintiff's mental impairments do not satisfy listings 12.04 and 12.06.

(Tr. 92.)

That same day, Dr. Kennemer completed a mental residual functional capacity assessment, wherein he agreed with Dr. Anderson's conclusion that Plaintiff is "not significantly limited" in ten categories of mental ability and "moderately limited" in six categories. (Tr. 95-96.) Dr. Kennemer also agreed that Plaintiff is capable of understanding and remembering short and simple instructions, carrying out short and simple instructions, completing short and simple tasks with "regular scheduled breaks," and "only superficial coworker contact" and no contact with the public. (Tr. 95-96.)

Also on November 19, 2013, Dr. Martin Lahr ("Dr. Lahr"), a non-examining state agency physician, completed a physical residual capacity assessment, wherein he agreed with Dr. Kehrli's conclusion that Plaintiff can lift and carry twenty pounds occasionally and ten pounds frequently, stand, sit, or walk up to six hours during an eight-hour workday, and push or pull in accordance with her lifting and carrying restrictions. (Tr. 93-95.) Dr. Lahr also agreed with Dr. Kehrli's conclusion that Plaintiff does not suffer from any postural, manipulative, visual, or communicative limitations, but he does need to avoid concentrated exposure to workplace hazards.

On December 6, 2013, Plaintiff visited Walde and reported "little change in his mood or health status since [their] last visit in July 2013." (Tr. 408.) Plaintiff also reported that he was "not interested . . . in taking medication for anxiety or depression," and that he was "not interested in mental health counseling to learn strategies to manage stress or anger," even though Plaintiff "recognize[d] these are problems in his life." (Tr. 408.) In her progress notes, Walde stated that Plaintiff was "calm and friendly," Plaintiff smiled when he spoke "about his granddaughter," Plaintiff's insight and judgment are limited, and Plaintiff's memory, behavior, orientation, attention, concentration, and thought content were all within normal limits. (Tr. 409.)

Walde also noted that Plaintiff "has symptoms of depression and anxiety with limited insight and low readiness for treatment," and discontinued his prescription for Zoloft because he was "not taking it." (Tr. 411.)

On February 19, 2014, Plaintiff established care with Dr. Anna Raphael ("Dr. Raphael") at Kaiser Permanente. Plaintiffs reported that he started using tobacco again and complained of daily headaches that were "getting worse," "nearly constant chest pain," "generalized fatigue and weakness," lower back pain, and "multiple joints pains from a history of brucellosis infection." (Tr. 421-22.) Dr. Raphael referred Plaintiff to cardiology regarding his atypical chest pain, noted that Plaintiff's headaches were "likely related to untreated" sleep apnea "or eye strain," stated that "brucellosis does not seem associated with joint pain" based on an "initial literature review," and recommended that Plaintiff continue taking Zoloft and participating in counseling. (Tr. 422-24.)

On February 21, 2014, Plaintiff presented for a cardiology consultation with Dr. Lori Lee McMullan ("Dr. McMullan") regarding his atypical chest pain. Plaintiff complained of chest pain, headaches, and "weakness all over his body," and reported that he "is too weak" to work and sits "all day watching" television, but added that he "actually exercises at [a] fitness center for [one] hour [three to five] times a week with no chest pain" and "some shortness of breath." (Tr. 427.)

On March 31, 2014, Dr. Raphael noted that a computed tomography ("CT") scan of Plaintiff's abdomen was "unremarkable" and did not show "anything that could cause his side pain." (Tr. 463.)

In a treatment note dated April 2, 2014, Dr. Raphael noted that Plaintiff recently felt like he was "about to pass out" after walking on the treadmill at his public gym and using the sauna

for five minutes, and that Plaintiff called an ambulance and was "diagnosed with unexplained fainting." (Tr. 468.) Dr. Raphael added that she spoke with a cardiologist who felt that Plaintiff's symptoms were "consistent with dehydration" and were "very unlikely to be cardiac" related. (Tr. 469.)

On April 2, 2014, an echocardiogram of Plaintiff's heart "show[ed] normal pumping function." (Tr. 472.)

On April 4, 2014, an ultrasound of Plaintiff's neck "showed no significant blocked arteries to the blood flow to his head," which "further support[ed]" that his "near fainting episode was from dehydration from sweating after walking on the treadmill and going to the sauna." (Tr. 475.)

On April 24, 2014, Plaintiff informed Dr. Raphael that he "only goes to the gym every [two] to [three] days instead of daily like before" as the result of fatigue, that he had difficulty tolerating an antibiotic used to treat a bacterial infection, that he experiences "shortness of breath episodes, sometimes associated with chest pain," that his anxiety had not increased, that he "does not want to take any more medications to treat anxiety or depression," that he "did not find the psychotherapy helpful," and that he chews tobacco and smokes two to three cigarettes a day. (Tr. 484-85.)

On April 30, 2014, Plaintiff visited the emergency room department at Kaiser Permanente, complaining of weakness, shortness of breath, dizziness, and chest and neck pain. (Tr. 495-96, 501.) Dr. Samer Halim Abufadil ("Dr. Abufadil") recommended further gastrointestinal ("GI") evaluation because he felt Plaintiff's symptoms were "most consistent with GI issues." (Tr. 498.) An upper GI series revealed "[m]arked gastroesophageal reflux" and "incomplete relaxation of the proximal cervical esophageal sphincter, possibly secondary to

inflammation from the reflux." (Tr. 509.) Plaintiff was discharged with a diagnosis of chest pain "most likely due to [GI] disease, i.e., likely resistant reflux disease." (Tr. 510; *see also* Tr. 517, observing that Plaintiff's upper GI series "showed severe" gastroesophageal reflux disease or "GERD").

In May 2014, Plaintiff underwent further GI testing (manometry and pH tests), which revealed that his esophagus appeared "to be contracting normally," he has "significant GERD," and "one episode of chest pain during the test[ing] seemed to correlate with a reflux episode." (Tr. 535.)

In a treatment note dated July 9, 2014, Dr. Raphael noted that Plaintiff complained of anxiety, headaches, lightheadedness, shakiness, chest tightness, and "paresthesia in [the] hands," that Plaintiff wanted a second opinion from cardiology after they were "unable to find an acute cardiac cause," and that Plaintiff did "not think psychiatric factors are related to his somatic symptoms." (Tr. 560; *but cf.* Tr. 524, indicating that a gastroenterologist previously opined that many of Plaintiff's symptoms "may be anxiety related," Tr. 562, "Patient's constellation of somatic symptoms not related to exertion is most consistent with anxiety and depression, but for some reason this diagnosis has not been easy for patient to acknowledge or accept treatment for."). Later that same day, Dr. Raphael informed Plaintiff that his "chest x-ray was normal." (Tr. 564.)

On July 21 2014, Plaintiff underwent a cardiac catheterization procedure based on continued complaints of atypical chest pain. (Tr. 577-579.) The procedure showed "a long moderate lesion" in the left anterior descending artery ("LAD"), "which was strongly hemodynamically significant by fractional flow reserve." (Tr. 579.) As a result, Dr. Richard

Crawford ("Dr. Crawford") "placed a long bare metal stent [in the LAD] with a very good result." (Tr. 579.)

On July 26, 2014, Plaintiff underwent a second cardiac catheterization procedure based on "recurrent chest pain radiating to [the right] shoulder." (Tr. 616-17.) The procedure showed "moderate nonobstructive" coronary artery disease. (Tr. 617.) Dr. Ulrich Luft ("Luft") noted that Plaintiff's angiogram was "unchanged from his . . . angiogram last week," and that it was "very unlikely" that his "moderate disease" was "responsible for his current clinical syndrome." (Tr. 619; *see also* Tr. 659, noting that "no cardiac problem was found" during the procedure on July 26, 2014).

On September 15, 2014, Dr. Raphael informed Plaintiff that another chest x-ray came back "normal." (Tr. 663.)

On November 3, 2014, Plaintiff established care with Dr. Daniel Towns ("Dr. Towns"), a psychiatrist at Oregon Health and Sciences University. Dr. Towns' diagnoses were major depressive disorder, rule out posttraumatic stress disorder, and coronary artery disease post-stent placement. (Tr. 808.) Dr. Towns provided Plaintiff with a limited trial of a medication to treat his "anxiety/insomnia," noted that he would stop prescribing that medication in "a month or two" or once Plaintiff started "doing somewhat better," and opined that Plaintiff would benefit the most from "psychological interventions," such as "general support, processing of his experiences, encouraging healthy lifestyle behaviors, and efforts to increase self-esteem and self-worth." (Tr. 807-08.)

On November 17, 2014, Plaintiff was evaluated in the emergency room department at Kaiser Permanente based on complaints of chest pain and pressure. Dr. Duncan York ("Dr. York") noted that Plaintiff's symptoms suggested "some component of anxiety," and that he

reviewed the case with a cardiologist who felt that Plaintiff's symptoms "sound[ed] atypical for an [acute coronary syndrome] and unlikely related to his underlying coronary artery disease." (Tr. 691.)

In a letter to the Social Security Administration dated February 27, 2015, Dr. Towns and Olga Demyanenko ("Demyanenko"), a treating qualified mental health practitioner, stated that: Plaintiff has received mental health treatment at the Intercultural Psychiatry Program at Oregon Health and Sciences University since November 3, 2014, Plaintiff continued to experience the same mental health symptoms "despite medication" (an anti-depressant and an anxiety medication), Plaintiff's anti-depressant was "discontinued . . . due to interactions" with a blood thinner, Plaintiff "was preoccupied with somatic complaints," Plaintiff satisfies the criteria of listings 12.04 and 12.06, Plaintiff suffers from "marked restriction in his ability to maintain social functioning and in maintaining concentration, persistence, or pace," and although Plaintiff "has not had perfect adherence to his medication regimen," Dr. Towns and Demyanenko believe that Plaintiff's "symptoms do not significantly improve even when [he is] on medication." (Tr. 821-22.)

On March 10, 2015, Plaintiff appeared and testified at a hearing before an Administrative Law Judge ("ALJ"). (Tr. 48-68.) Plaintiff testified that his condition has "changed tremendously" since he suffered a heart attack in January 2013. (Tr. 50.) For example, Plaintiff testified that he experiences shortness of breath, numbness in his hands and arms, fatigue, headaches, reduced appetite, drowsiness, shivers, shaky hands, and irritability. (Tr. 51-52.) Plaintiff also testified that he lives with his wife and kids, his wife "does the family chores," he "[a]lmost always" feels sad, does not remember the names of his medications, he cannot walk more than roughly twenty to forty yards at a time due to shortness of breath and leg difficulties,

and he has a difficult time climbing the stairs at his house and lifting and holding onto objects.[4] (Tr. 51-57.)

The ALJ also posed a series of hypothetical questions to a Vocational Expert ("VE") who testified at Plaintiff's hearing. First, the ALJ asked the VE to assume that a hypothetical worker of Plaintiff's age, education, and work experience could perform light work that involved (1) lifting and carrying twenty pounds occasionally and ten pounds frequently, (2) sitting, standing, and walking up to six hours in an eight-hour workday, (3) pushing and pulling in accordance with the lifting and carrying restrictions, (4) never "operating a motor vehicle as part of the day-to-day job" or working around hazards, such as moving mechanical parts or unprotected heights, (5) performing "simple tasks" and making "simple work-related decision," and (6) occasional interaction with co-workers, but only "incidental contact" with the public. (Tr. 62-63.) The VE testified that the hypothetical worker could not perform Plaintiff's past work as a janitor, but he could be employed as an electronics worker, plumbing hardware assembler, and small products assembler.

Responding to the ALJ's second question, the VE confirmed that the hypothetical worker could not perform the jobs described above if he "would be off task roughly a quarter of the day due to difficulties concentrating" and "difficulties with memory." (Tr. 64.) Responding to the questions posed by Plaintiff's attorney, the VE testified that (1) the number of available electronics worker, plumbing hardware assembler, and small products assembler jobs would be reduced "significantly" if the hypothetical worker needed "to have instructions in his or her own language in order to perform" the jobs, (2) "a person that couldn't learn a simple job in [thirty] days would have a hard time keeping that job," and (3) the hypothetical worker could not

---

[4] Plaintiff's wife also testified at the hearing and corroborated much of Plaintiff's testimony. (*See* Tr. 57-61.)

perform the electronics worker, plumbing hardware assembler, and small products assembler jobs if he was limited to sedentary work because all three jobs are considered light work. (Tr. 64-66.)

In a written decision issued on June 2, 2015, the ALJ applied the five-step evaluation process set forth in 20 C.F.R. § 416.920(a)(4), and determined that Plaintiff was not disabled. *See infra*. The Social Security Administration Appeals Council denied Plaintiff's petition for review, making the ALJ's decision the Commissioner's final decision. Plaintiff timely appealed to federal court.

## THE FIVE-STEP SEQUENTIAL ANALYSIS

## I. LEGAL STANDARD

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are: (1) whether the clamant is presently engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the claimant can return to any past relevant work; and (5) whether the claimant is capable of performing other work that exists in significant numbers in the national economy. *Id.* at 724-25. The claimant bears the burden of proof at the first four steps. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of those steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

## II.    THE ALJ'S DECISION

The ALJ applied the five-step sequential evaluation process to determine if Plaintiff is disabled. 20 C.F.R. § 416.920(a)(4). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 15, 2013, the day he filed his protective application. (Tr. 24.) At step two, the ALJ determined that Plaintiff had the following severe impairments: "status post myocardial infarction with stent placement, angina, chronic headaches, sleep apnea, gastroesophageal reflux disease . . . , hyperlipidemia, hypertensive cardiovascular disease, post-traumatic stress disorder . . . , depression, and anxiety." (Tr. 24.) At step three, the ALJ found that Plaintiff did not have an impairment that meets or equals a listed impairment. (Tr. 27.) The ALJ then concluded that Plaintiff had the residual functional capacity ("RFC") to perform "light work" that involved (1) occasionally lifting and carrying twenty pounds and frequently lifting and carrying ten pounds, (2) sitting, standing, or walking up to six hours in an eight-hour workday, (3) pushing and pulling in accordance with the lifting and carrying restrictions, (4) never "working around hazards, such as unprotected heights, operating a motor vehicle, or moving mechanical parts, as part of his day-to-day job," (5) performing simple tasks and making simple work-related decisions, (6) occasional interaction with co-workers, and (7) never "interacting with the public, except for incident contact, such as passing someone in hallways." (Tr. 30.) At step four, the ALJ found that Plaintiff could not perform any past relevant work. (Tr.

37.) At step five, the ALJ determined that Plaintiff is not disabled because he can perform other jobs that exist in significant numbers in the national economy, including work as an electronics worker, plumbing hardware assembler, and small products assembler. (Tr. 39.) Accordingly, the ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 39.)

## STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is defined as "'more than a mere scintilla [of evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*, 180 F.3d at 1097). Instead, the district court must consider the entire record, weighing the evidence that both supports and detracts from the Commissioner's conclusions. *Id.* If the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the district court may not substitute its judgment for the judgment of the ALJ. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## DISCUSSION

In this appeal, Plaintiff argues that the ALJ erred by: (1) failing to provide germane reasons for discounting the lay witness testimony provided by his wife, Sonia Akhmedov ("Mrs.

Akhmedov"); and (2) failing to provide legally sufficient reasons for rejecting the opinion of his treating psychiatrist, Dr. Towns. As explained below, the Court concludes that the ALJ's decision is free of harmful legal error and supported by substantial evidence in the record. Accordingly, the Court affirms the Commissioner's denial of Plaintiff's application for SSI benefits.

## I.  LAY WITNESS TESTIMONY

### A.  Applicable Law

An ALJ must consider lay witness testimony concerning a claimant's ability to work. *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009). The ALJ cannot disregard such testimony without providing reasons that are germane to each witness. *Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006). "Inconsistency with medical evidence is one such reason." *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005). "Germane reasons for rejecting a lay witness' testimony [also] include inconsistencies between that testimony and the claimant's presentation to treating physicians or the claimant's activities, and the claimant's failure to participate in prescribed treatment." *Barber v. Astrue*, No. 10–1432, 2012 WL 458076, at *21 (E.D. Cal. Feb. 10, 2012). Furthermore, "when an ALJ provides clear and convincing reasons for rejecting the credibility of a claimant's own subjective complaints, and the lay-witness testimony is similar to the claimant's complaints, it follows that the ALJ gives 'germane reasons for rejecting' the lay testimony." *Williams v. Astrue*, 493 F. App'x 866, 869 (9th Cir. 2012) (citation omitted).

### B.  Application of Law to Fact

Plaintiff argues that the ALJ erred by failing to provide "a germane reason for rejecting" Mrs. Akhmedov's testimony. (Pl.'s Opening Br. at 2, 13.) In support of this assertion, Plaintiff notes that lay witness testimony is competent evidence that an ALJ may not disregard without

comment, and that the ALJ's written decision discussed Mrs. Akhmedov's testimony, but the ALJ "gave no reason whatsoever—let alone a germane reason—for ignoring" it. (Pl.'s Opening Br. at 13.)

In response, the Commissioner acknowledges that the ALJ "erred by failing to weigh" Mrs. Akhmedov's testimony. (Def.'s Br. at 11.) The Commissioner, however, argues that the error was harmless because (1) Mrs. Akhmedov's testimony "does not include any limitations that Plaintiff did not already describe himself in his own testimony," (2) the ALJ provided "several, well-supported reasons" for discounting Plaintiff's testimony, (3) Plaintiff "has not challenged the ALJ's findings" with respect to his own testimony, and thus (4) the ALJ's failure to weigh Mrs. Akhmedov's testimony was harmless error because the ALJ's reasons for discounting Plaintiff's testimony "apply equally" to Mrs. Akhmedov's testimony. (Def.'s Br. at 11.)

In his reply brief, Plaintiff argues for the first time that the ALJ erred in discounting his testimony and, in turn, argues that the ALJ's treatment of Mrs. Akhmedov's testimony was not harmless error. (*See* Pl.'s Reply at 14-16, arguing for the first time that the ALJ "offered no legally sufficient reason to reject Plaintiff's testimony," and arguing that, as a consequence, the harmless error doctrine "is of no help" to the Commissioner in this case; *but cf.* Pl.'s Opening Br. at 2, arguing only that the ALJ erred in rejecting Dr. Towns' opinion and Mrs. Akhmedov's testimony).

In *Thrasher v. Colvin*, 611 F. App'x 915 (9th Cir. 2015), the claimant's reply brief raised "two new arguments" that were not addressed in her opening brief. *Id.* at 918. The Ninth Circuit held that the claimant waived her new arguments by not raising them in her opening brief. *Id.*; *see also* Zango, Inc. v. Kaspersky Lab, Inc., 568 F.3d 1169, 1177 n.8 (9th Cir. 2009) (noting that

"arguments not raised by a party in an opening brief are waived"); *United States v. Puerta*, 982 F.2d 1297, 1300 n.1 (9th Cir. 1992) (stating that "[n]ew arguments may not be introduced in a reply brief").

Similarly, in *Johnson v. Colvin*, No. 13-cv-01139-HZ, 2014 WL 3851140, at *5 n.2 (D. Or. Aug. 1, 2014), the claimant argued for the first time in his reply brief that the Commissioner "did not address the improper rejection" of certain testimony. *Id.* The *Johnson* court noted that the Commissioner did not address the argument because it did "not appear in [the] opening brief," and held that the claimant waived the assignment of error by raising it for the first time in his reply. *Id.*; *see also Marquard v. New Penn Fin., LLC*, No. 3:17-cv-00549-SI, 2017 WL 4227685, at *10 (D. Or. Sept. 22, 2017) ("Because this argument was first raised in a reply brief and is not based on new or changed law, it is waived."); *Reyes v. Comm'r Soc. Sec. Admin.*, No. 15-cv-00034-HZ, 2015 WL 13229207, at *7 (D. Or. Dec. 18, 2015) (citing *Thrasher* and holding that the claimant waived an argument regarding the ALJ's treatment of certain opinion evidence); *Jones v. Astrue*, No. 09-cv-01504, 2010 WL 5111457, at *7 (E.D. Cal. Dec. 9, 2010) ("Because [the claimant] raises this issue for the first time in his reply, he has waived the issue.").

Consistent with the above authorities, the Court concludes that Plaintiff waived any argument that the ALJ erred in discounting Plaintiff's testimony because Plaintiff first raised the argument in his reply brief, which deprived the Commissioner of the opportunity meaningfully to respond, and because it is evident from the reply that Plaintiff's argument is not based on new or changed law.

In any event, the Court notes that the ALJ provided several legally sufficient reasons for discounting Plaintiff's testimony. For example, the ALJ observed that Plaintiff's testimony

conflicted with his reported activities. (*See* Tr. 36, noting that Plaintiff "reported that he went to the gym and walked on a treadmill, then went into a sauna . . . , despite testifying that he could not perform any activities and that he rarely left the house," *compare* Tr. 427, indicating that on February 24, 2014, Plaintiff reported that he "actually exercises at [a] fitness center for [one] hour [three to five] times a week with no chest pain," Tr. 468, indicating that on April 1, 2014, Plaintiff "had not felt well," but he "went to [the] gym anyway" to walk on the treadmill and use the sauna, *and* Tr. 484, indicating that in late April 2014, Plaintiff reported that he "only goes to the gym every [two] to [three] days instead of daily like before" a recent incident where he almost passed out due to dehydration, *with* Tr. 52-56, indicating that Plaintiff testified that he cannot do any chores, cannot walk more than roughly twenty to forty yards at a time, cannot always lift a gallon of milk, "tr[ies] to be alone," and does not seek "any company and . . . often [times just] go[es] to [his] room"). It is appropriate for an ALJ to discount a claimant's testimony on this ground. *See Samuels v. Colvin*, 658 F. App'x 856, 857 (9th Cir. 2016) (holding that the ALJ provided clear and convincing reasons for discounting the claimant's testimony, and noting that the claimant's "self-reported activities" were "inconsistent" with the claimant's "estimation of her abilities").

Additionally, the ALJ observed that Plaintiff's "use of medications does not suggest the presence of an impairment that is more limiting than found in this decision." (Tr. 37.) Before making this statement, the ALJ observed that Plaintiff complained of mental health symptoms, yet the record indicates that Plaintiff failed to follow recommended treatments. (*See* Tr. 33-34, discussing Plaintiff's medical records and reports to various treating providers, and observing that on more than one occasion Plaintiff informed treating providers that he did not "wish to have mental health counseling to learn strategies to manage his stress or anger," that he "was not

interested in taking medication for anxiety or depression," and that he did not "believe psychiatric factors were related to his somatic symptoms," even though a doctor opined otherwise, *cf.* Tr. 330-31, stating that mental impairments were the "likely cause" of Plaintiff's fatigue and difficulty breathing, Tr. 408, 411, stating that Plaintiff reported that he was "not interested" in mental health counseling or taking medication for anxiety or depression, even though he recognized that those impairments "are problems in his life," discontinuing Plaintiff's prescription for Zoloft because he was "not taking it," and noting that Plaintiff exhibited a "low readiness for treatment," Tr. 484-85, indicating that Plaintiff reported that he did "not want to take any more medications to treat anxiety or depression" and that he "did not find the psychotherapy helpful," Tr. 555, observing that "effective treatment for all psycho conditions is limited given [Plaintiff's] unwilling[ness] to try more [medications] or see [a] therapist at this time," Tr. 560, indicating that Plaintiff did "not think psychiatric factors are related to his somatic symptoms," Tr. 524, indicating that a gastroenterologist previously opined that many of Plaintiff's physical symptoms "may be anxiety related," Tr. 562, stating that Plaintiff's "constellation of somatic symptoms" were "most consistent with anxiety and depression, but for some reason this diagnosis has not been easy for [him] to acknowledge or accept treatment for," Tr. 691, observing that Plaintiff's physical symptoms were indicative of "some component of anxiety"). It is appropriate for an ALJ to discount a claimant's testimony when he fails to follow recommended treatments. *See Stenberg v. Comm'r Soc. Sec. Admin.*, 303 F. App'x 550, 552 (9th Cir. 2008) (affirming the ALJ's decision to discount the claimant's subjective symptom testimony, and noting, *inter alia*, that the claimant was not complaint "with recommended treatments"); *see also Phelps v. Berryhill*, ---- F. App'x ---- , 2017 WL 5157244, at *1 (9th Cir. Nov. 7, 2017) ("[An] ALJ's 'findings are upheld if supported by inferences reasonably drawn

from the record'" (quoting *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004))); *Magallanes v. Bowen*, 881 F.2d 747, 744 (9th Cir. 1989) ("As a reviewing court, we are not deprived of our faculties for drawing specific and legitimate inferences from the ALJ's opinion. It is proper for us to read the paragraph discussing [certain] findings and opinion[s], and draw inferences relevant to [other] findings and opinion[s], if those inferences are there to be drawn.").

The ALJ also found that Plaintiff's claim of disability was undermined by a number of "clinical examinations and objective test results" that did not reveal "the presence of any abnormalities that would be 'severe' enough to prevent [him] from performing work at the light exertional level." (Tr. 37, citing specifically to a number of records in Exhibit 6F; *but cf.* Pl.'s Reply Br. at 14-15, failing to list this specific reason as one provided by the ALJ in support of his decision to find Plaintiff less than fully credible, but noting that the ALJ also stated the medical evidence was "relatively weak" and then asserting that the ALJ's reason was not sufficiently specific because he "identified no particular medical record" to support his finding and "simply referred to the record as a whole"). It is appropriate for an ALJ to discount a claimant's testimony to the extent it is inconsistent with medical evidence. *See Watkins v. Comm'r Soc. Sec. Admin.*, 611 F. App'x 903, 904 (9th Cir. 2015) (holding that inconsistent "medical evidence" is a specific, clear, and convincing reason for rejecting a claimant's symptom testimony).

Having rejected Plaintiff's untimely argument that the ALJ "offered no legally sufficient reason" to discount his testimony, the Court must now address whether the ALJ's treatment of Mrs. Akhmedov's testimony was harmless error. In *Molina v. Astrue*, 674 F.3d 1104 (9th Cir. 2012), the Ninth Circuit addressed an ALJ's failure to discuss lay witness testimony provided by

the claimant's family members. *Id.* at 1122. The Ninth Circuit observed that the lay witnesses' testimony "did not describe any limitations beyond those [the claimant] herself described, which the ALJ discussed at length and rejected based on well-supported, clear and convincing reasons." *Id.* Since the evidence that the ALJ referred to in discrediting the claimant's testimony also discredited the lay witnesses' testimony, the Ninth Circuit held that "the ALJ's failure to give specific witness-by-witness reasons for rejecting the lay testimony" was harmless error because it "did not alter the ultimate disability determination." *Id.*; *see also id.* at 1121-22 (joining "the Eighth Circuit's well-reasoned determination that an ALJ's failure to comment upon lay witness testimony is harmless where the same evidence that the ALJ referred to in discrediting the claimant's claims also discredits the lay witness's claims.") (citation, quotation marks, and brackets omitted).

In this case, Mrs. Akhmedov did not describe any limitations beyond those that Plaintiff described. (*Compare* Tr. 50-57, testifying that Plaintiff's condition has "changed tremendously" following his heart attack in January 2013, Mrs. Akhmedov handles all the chores, Plaintiff does not have friends due to his irritability, Plaintiff experiences difficulty lifting light objects, using the stairs, and walking, and Plaintiff suffers from "feelings of sadness," forgetfulness, shaky hands, shortness of breath, numbness in his arms and hands, and headaches, *with* Tr. 57-61, testifying that Plaintiff's condition has deteriorated following his heart attack in January 2013, Mrs. Akhmedov handles all the chores, including the cooking, cleaning, grocery shopping, and carrying the groceries into the house, Plaintiff has limited friends or acquaintances and becomes "highly irritable" around others, Plaintiff experiences difficulty lifting light objects, using the stairs, and walking, and Plaintiff suffers from fatigue, depression, anxiety, forgetfulness, and shivering). Accordingly, the Court concludes that the ALJ's failure to weigh Mrs. Akhmedov's

testimony was harmless error, because the same evidence that the ALJ referred to in discrediting Plaintiff's testimony also discredits Mrs. Akhmedov's testimony. *See also Perkins v. Berryhill*, No. 16-6089, 2017 WL 1380408, at *4 (C.D. Cal. Apr. 17, 2017) (stating that an ALJ's decision can "be affirmed even if the ALJ did not 'clearly link' rejection of the specific lay testimony to the reasons expressed for rejecting the claimant's similar testimony" (citing *Molina*, 674 F.3d at 1121)).

## II.     MEDICAL OPINION EVIDENCE

### A.     Applicable Law

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). In the event "a treating or examining physician's opinion is contradicted by another doctor, the '[ALJ] must determine credibility and resolve the conflict.'" *Id.* (citation omitted). "An ALJ may only reject a treating physician's contradicted opinions by providing 'specific and legitimate reasons that are supported by substantial evidence.'" *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) (quoting *Ryan v. Comm'r Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008)).

"An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). Merely stating conclusions is insufficient: "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* "[A]n ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting

without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Id.* at 1012-13 (citation omitted).

**B.     Application of Law to Fact**

Plaintiff argues that the ALJ failed to provide legally sufficient reasons for discounting the opinion of his treating psychiatrist, Dr. Towns, who opined that Plaintiff suffers from marked limitations in social functioning and his ability to maintain concentration, persistence, or pace. Plaintiff acknowledges that the specific and legitimate reasons standard applies. (*See* Pl.'s Opening Br. at 2, 9, 11-12, acknowledging that the above standard applies, and noting that Dr. Towns' opinion was contradicted by "medical evidence in the record" and the opinions of non-examining state agency psychological consultants who "concluded that Plaintiff's social functioning is less than markedly limited," which "reduce[s] the standard from 'clear and convincing' to 'specific and legitimate'"); (*see also* Tr. 74, 92, stating that the non-examining state agency psychological consultants opined that Plaintiff suffers only from moderate limitations in social functioning and his ability to maintain concentration, persistence, or pace); *Wallis v. Colvin*, 608 F. App'x 489, 490 (9th Cir. 2015) ("Where conflicting medical opinions exist, the ALJ must give specific, legitimate reasons for disregarding the opinion of the treating physician.").

Without citing to any authority, however, Plaintiff argues that "having used the existence of contradictory medical evidence to reduce the standard from 'clear and convincing'. . . , it is error to use that same contradictory evidence to supply the required 'specific and legitimate' reasoning." (Pl.'s Opening Br. at 12.) The Court disagrees. The contradictory opinion of a non-examining physician can serve as (1) the basis for reducing the standard of review and (2) one of the bases for rejecting a treating doctor's opinion, as long as the ALJ gives other specific and

legitimate reasons, supported by substantial evidence, for discounting the treating doctor's opinion. *See Revels v. Berryhill*, 874 F.3d 648, 662-64 (9th Cir. 2017) (applying the specific and legitimate reasons standard because the treating doctor's opinion was "contradicted by the findings of," among others, "the non-examining doctors from the state agency," holding that the ALJ provided several erroneous reasons for discounting the treating doctor's opinion, and thus reversing the ALJ's decision because the "only remaining reason the ALJ gave for rejecting" the treating doctor's "opinion was the contradictory opinions of the state doctors," which "cannot by themselves constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician") (citation, quotation marks, and brackets omitted); *see also Cha Yang v. Comm'r Soc. Sec. Admin.*, 488 F. App'x 203, 205 (9th Cir. 2012) ("[A]lthough a state agency physician's opinion, standing alone, cannot constitute substantial evidence, it can be substantial evidence when the ALJ points to other evidence as well." (citing *Magallanes*, 881 F.2d at 752-53)); *Morgan v. Comm'r Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999) ("[W]e have consistently upheld the Commissioner's rejection of the opinion of a treating or examining physician, based *in part* on the testimony of a nontreating, nonexamining medical advisor.").

With that in mind, the Court turns to the reasons the ALJ provided for discounting Dr. Towns' opinion. First, the ALJ discounted the opinion of Dr. Towns—a treating psychiatrist who only expressed opinions regarding mental impairments—on the ground that Dr. Towns' opinion was inconsistent with Plaintiff's performance on mental status examinations. (*See* Tr. 29, assigning "little weight" to Dr. Towns' opinion and noting that, as summarized above and later in the decision, the record "contradicts" his opinion "several times in mental status examinations since 2013"). For example, the ALJ noted that two of Plaintiff's treating providers observed on

more than one occasion that Plaintiff's attention, concentration, and thought content were within normal limits. (Tr. 28; *see also* Tr. 345, stating in May 21, 2013, that Plaintiff's "[o]rientation, judgment, insight, and memory [were] all within normal limit," Tr. 340-41, stating on June 5, 2013, that Plaintiff's orientation, judgment, insight, memory, attention, concentration, and thought content were "all within normal limits," Tr. 397-98, stating on June 28, 2013, that Plaintiff's orientation, judgment, memory, attention, concentration, and thought content were all within normal limits, Tr. 409, stating on December 6, 2013, that Plaintiff's memory, behavior, orientation, attention, concentration, and thought content were all within normal limits; *but cf.* Tr. 822, Dr. Towns' opinion that Plaintiff "is unable to concentrate" and suffers from marked limitations in social functioning and his ability to maintain, concentration, persistence, or pace). It was reasonable for the ALJ to determine that Plaintiff's performance on mental status examinations contradicted Dr. Towns' opinion regarding Plaintiff's mental impairments. *See Whitten v. Colvin*, 642 F. App'x 710, 711 (9th Cir. 2016) (holding that the ALJ satisfied the specific and legitimate reasons standard, and noting that the claimant's "longitudinal treatment records, his responses on his mental status examinations, his activities of daily living, and the opinion of [a] state agency non-examining psychologist" contradicted the psychologists' opinions).

The ALJ also discounted Dr. Towns' opinion on the ground that it "contrasts sharply with other evidence of record," such as the opinions of the non-examining state agency psychological consultants, who reviewed "the same records" and issued conflicting opinions regarding whether Plaintiff's mental impairments met or equaled listings 12.04 and 12.06 since the amended onset

date.[5] (Tr. 29.) It was appropriate for the ALJ to discount Dr. Towns' opinion on the ground that it was contradicted by the opinions of the state agency psychological consultants. *See Whitten, 642 F. App'x at 711* (holding that a state agency psychologist's contradictory opinion is a specific and legitimate reason to "give little weight" to psychologists' opinions as to the severity of mental impairments).

Additionally, the ALJ discounted Dr. Towns' opinion because he "began treating the claimant in November 2014, nearly two years after the claimant's amended alleged onset date of [January 7, 2013], yet [he] opine[d] [in February 2015 that] the claimant's symptoms satisfied Listings 12.04 and 12.06 since January 7, 2013." (Tr. 29.) It was appropriate for the ALJ to consider the length of the treating relationship and the supportability of Dr. Towns' opinion. *See Trevizo v. Berryhill, 871 F.3d 664, 676 (9th Cir. 2017)* (holding that the ALJ failed to offer specific and legitimate reasons for rejecting the contradicted opinion of the claimant's primary treating physician, and holding that, standing "alone," the ALJ's failure to "consider factors such as the length of the treating relationship, the frequency of examination, the nature and extent of the treatment relationship, or the supportability of the opinion," constituted "reversible legal error"). Further, the ALJ alluded to the fact that although Dr. Towns is currently a treating physician, he had no personal knowledge of Plaintiff's condition between January 7, 2013 and

---

[5] Listings 12.04 and 12.06 "each contain an identical 'Paragraph B,' which provides that a claimant may prove disability by showing, among other things, any two of these limitations: (1) marked restriction of activities of daily living; or (2) marked difficulties in maintaining social functioning; or (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration." *Bryant v. Colvin, 571 F. App'x 186, 189 (4th Cir. 2014)* (citation, quotation marks, and brackets omitted). Unlike Dr. Towns, the state agency psychologists opined that Plaintiff did not satisfy listing 12.04 and 12.06, or the "Paragraph B" criteria because Plaintiff suffers only from mild restrictions in his activities of daily living, moderate difficulties in social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 74, 92; *but cf.* Tr. 822, Dr. Towns' opinion that Plaintiff met the Paragraph B criteria.)

November 3, 2014, which means that Dr. Towns was in no different position than any other non-treating, non-examining doctor. *See DeBerry v. Comm'r Soc. Sec. Admin.*, 352 F. App'x 173, 176-77 (9th Cir. 2009) ("Although Dr. Lowengart is currently a treating physician, she has no personal knowledge of [the claimant's] condition during the applicable period and offered her opinion that [the claimant] was disabled during that period based on a retrospective review of the medical records. Thus, for purposes of her disability opinion derived from her review of historic medical records, Dr. Lowengart was in no different position than any other non-treating physician."); *see also id.* at 177 ("noting that a treating physician offering a retrospective opinion, with no personal knowledge of the claimant's historical condition, was little different from any non-treating physician with regard to that time period and was not entitled to enhanced deference merely because of his status as a treating physician." (citing *Magallanes*, 881 F.2d at 754)).

Finally, in discounting Dr. Towns' opinion evidence, the ALJ noted that "the possibility always exists that a medical provider may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another," and that "[w]hile it is difficult to confirm the presence of such motives . . . , they are more likely in situations in which the opinion in question departs substantially from the rest of the evidence of record, as in the current case." (Tr. 29.) This finding was erroneous because the ALJ's assertion that Dr. Towns' opinion may be affected by sympathy or a desire to avoid tension with Plaintiff, who had "shown at least some irritation with his providers on more than one occasion" (Tr. 29), is speculative and not supported by substantial evidence in the record. *See Colter v. Berryhill*, 685 F. App'x 616, 617 (9th Cir. 2017) (holding that the ALJ failed to provide specific and legitimate reasons for discounting a medical opinion, and noting that "the ALJ's assertion that Dr. Aryal's opinion may

be affected by sympathy or a desire to avoid tension is speculative and unsupported.") (citations omitted).

In sum, although the ALJ erred in discounting Dr. Towns' opinion, the error was harmless because the ALJ provided other specific and legitimate reasons for discounting Dr. Towns' opinion. *See DeBerry*, 352 F. App'x at 176 (holding that an ALJ's "error was harmless because the ALJ gave several specific and legitimate other reasons supported by substantial evidence for rejecting [the treating physician's] opinion that [the claimant] was disabled" (citing *Bayliss*, 427 F.3d at 1216)).[6]

## CONCLUSION

For the reasons stated, the Court AFFIRMS the Commissioner's decision because it is free of harmful legal error and supported by substantial evidence.

IT IS SO ORDERED.

DATED this 21st day of November, 2017.

_Stacie F. Beckerman_
STACIE F. BECKERMAN
United States Magistrate Judge

---

[6] Plaintiff also argues that the ALJ "identified no evidence that shows that [he] can maintain concentration, persistence, or pace for more than the length of [a] brief office visit with a medical provider." (Pl.'s Opening Br. at 12.) The Court disagrees. The ALJ assigned great weight to the opinions of the state agency psychological consultants, who opined that, despite suffering from moderate difficulties in social functioning and maintaining concentration, persistence, or pace, Plaintiff is not disabled because he is able to "understand, remember, and carry out short, simple instructions," is able to perform "short simple tasks with regularly scheduled breaks," "would perform best with only superficial coworker contact," and "should not work in contact with the public." (Tr. 26, 28, 35; *see also* 74-80, 92-98.) The ALJ incorporated those limitations into the RFC assessment and hypothetical posed to the VE, and relied on the VE's testimony that someone with these limitations could still work. (Tr. 30, 39, 61-68.)